IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| HUEY P. MYLES, #1186445 | § | |
| VS. | § | CIVIL ACTION NO. 6:09cv299 |
| DAVID LANGSTON, ET AL. | § | |

## MEMORANDUM OPINION AND ORDER OF DISMISSAL

Plaintiff Huey P. Myles, a prisoner confined at the Michael Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis*, filed the above-styled and numbered civil rights lawsuit pursuant to 42 U.S.C. § 1983. The complaint was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636(c). The present Memorandum Opinion concerns the Defendants' motion for summary judgment (docket entry #30). The Plaintiff did not file a response.

### Plaintiff's Allegations

The original complaint was filed on July 6, 2009. On February 16, 2010, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985), to consider the Plaintiff's claims.

The Plaintiff arrived at the prison system in 2002. He had gum disease. The Plaintiff testified that a plan was developed to pull his teeth and to provide him with dentures. Pursuant to the plan, prison dentists started pulling his teeth. The Plaintiff testified that he has only two teeth remaining. During the course of the execution of the plan, dental administrators changed the policy. Under present policy, dentures are provided only when there is a medical necessity. The Plaintiff

1

was advised of the change in policy and told that he would not receive dentures. One of the reasons provided to him was that his Body Mass Index was 34, which was above the normal range of 18.5 to 25. The Plaintiff testified that he must gum his food, which makes his gums sore. In his complaint, he further noted that he has had problems with bleeding gums and infection. He asked for a pass to have more time to eat his food, but the request was denied.

The Plaintiff testified that he has other medical problems as well, which are not part of this lawsuit. Nonetheless, he has liver disease, and the medication for his liver disease has made the problems with his gums worse. The liver problems have also distended his stomach. He acknowledged that he presently weighs about 200 pounds.

On February 16, 2010, the Court issued a Memorandum Opinion (docket entry #19) permitting the Plaintiff to proceed with his claims against Dr. David Langston, a Michael Unit dentist, and Dr. Owen Murray, the doctor in charge of medical and dental policy.

Defendants' Motion for Summary Judgment

The Defendants filed a motion for summary judgment (docket entry #30) on May 13, 2010. In support of the motion, they submitted the following evidence:

Exhibit A: Relevant portions of the Plaintiff's unit medical records;

Exhibit B: Relevant portions of the Plaintiff's patient liaison records;

Exhibit C: Relevant portions of the Plaintiff's medication compliance records;

Exhibit D: Affidavit of Billy Horton, D.D.S., UTMB-Correctional Managed Care Dental Director;

Exhibit E: Affidavit of Defendant Owen J. Murray, D.O., Vice President and Chief Executive for UTMB-CMC;

> Exhibit F: Correctional Managed Health Care policy E-36.4, concerning Dental Prosthondontic Services; and
>
> Exhibit G: Correctional Managed Health Care policy E-36.5, concerning the Dental Utilization/Quality Review Committee.

The documents filed in support of the motion were submitted under seal (docket entry #35). The Defendants argued that they are entitled to summary judgment because the Plaintiff failed to establish a deliberate indifference claim, failed to overcome their entitlement to qualified immunity and failed to overcome their entitlement to 11th Amendment immunity.

The Defendants provided a thorough review of the facts based upon the summary judgment evidence. It should be initially noted that the records reveal that the first time that Defendant Dr. Langston attended to the Plaintiff was on August 21, 2008. Dr. Murray has never attended to the Plaintiff. Upon his arrival to the prison system, the Plaintiff was already missing several teeth and suffered from high blood pressure and liver disease. He was first evaluated on September 15, 2003. He submitted a sick call request on March 9, 2004, complaining of pain in his teeth. He was seen on the next day. A few weeks later, Dr. Scott Reinecke indicated that the Plaintiff's bone loss in his mouth was "severe" and that his situation was "hopeless." The Defendants asserted that it was apparent to dentists at the unit from a very early time that the Plaintiff would need to lose his teeth.

On April 11, 2004, the Plaintiff complained about tooth pain and was seen on the following day. During a follow-up appointment, on April 19, 2004, he consented to have four of his teeth extracted. The Defendants noted that there is no evidence that the Plaintiff was promised at that time that he would receive dentures. On April 24, 2004, the Plaintiff complained of pain, and doctors noted that he was still healing from the extraction of a few days earlier. In June, he was still in pain. Another set of extractions were scheduled. On July 7, 2004, two more teeth were removed. A small

portion of the root from one of his teeth was still remaining five days later. In October 2004, the Plaintiff had a walk-in appointment, and doctors decided to pull more teeth, although nothing definite was scheduled. He was seen again in December 2004, where no significant changes to his oral health was noted.

In April 2005, the Plaintiff had a debridement procedure. The Defendants explained that the procedural consists of the removal of unhealthy tissue, which was gum tissue in this case, so that healthy tissue can regrow. The Defendants noted that this procedure was the only dental record for the Plaintiff in all of 2005 and 2006.

In February 2007, the Plaintiff requested to have more of his teeth pulled. A dentist saw him shortly thereafter. The Defendants noted that the Plaintiff was also having problems with Hepatitis C, heartburn and pain in his hand. Three more teeth were extracted on March 9, 2007. In December 2007, an entry was made noting that the Plaintiff had never been placed on a special diet tray and that he regularly bought food from the commissary.

Defendant Langston attended to the Plaintiff for the first time on August 21, 2008. The Defendants noted that any decisions predating this event concerning the Plaintiff's dental treatment cannot be attributed to Dr. Langston and must be attributed to other dentists at the Michael Unit. It was reiterated that the medical records do not show that the Plaintiff was ever promised dentures or that a "plan" was created to pull his teeth over time. Instead, the Plaintiff's teeth were pulled sporadically and in groups of two to four at a time. The Defendants argued that the extractions suggest that the teeth came out only when it became medically necessary.

As of March 19, 2009, the Plaintiff had only a few teeth remaining. At that time, Dr. Eliasson, D.D.S., informed him about the few options available for tooth replacement. Dr. Eliasson

discussed his high Body Mass Index and offered him a blended diet, which was declined. The Plaintiff complained about oral pain in May. On May 27, 2009, Dr. Eliasson examined the Plaintiff and noted that his six remaining teeth should be extracted because they were "of no use," yet "causing harm."

The present lawsuit was filed on July 6, 2009.

In October 2009, the Plaintiff had his diet for health renewed. Dr. Langston removed four teeth and prescribed Ibuprofen on November 9, 2009. On November 16, 2009, Dr. Langston examined the Plaintiff for a blood clot in his gums, which was described as slight. On December 9, 2009, the Plaintiff asked for a slow eating pass because he had only two teeth remaining. On the following day, he was informed that he could have a blended diet but that dentists did not have the authority to give him a slow eating pass. The blended diet was again refused. On December 14, 2009, Dr. Wright referred the Plaintiff to have his remaining two teeth extracted. He was given a slow eating pass at that time. P.A. Pickthall noted oral ulcers, which were related to HCV treatment.

The Plaintiff's remaining two teeth were removed in the Spring of 2010. He is currently on a diet for health without snacks and has no present dental needs. None of his records indicate that his Body Mass Index is dropping or that he is losing weight. It was noted that the Plaintiff has not complained of, nor do the records show, issues with digestive difficulty, diarrhea, cramps, headaches, disfigurement, severe pain or blood in his stool. Although he takes many medication, the Plaintiff does not take anything for his teeth or gums. The Plaintiff's grievances reveal that he was informed of the dentures policy and the standard that dentures would be provided only if he had a "medical necessity." The Defendants asserted that the records do not indicate that Dr. Langston refused to treat the Plaintiff or intentionally ignored his complaints or treated him incorrectly.

The documents submitted by the Defendants reveal that the current policy on dentures went into effect on September 1, 2003. Dentures are provided to inmates only when "medically necessary." Dr. Billy Horton, Dental Director for UTMB-Correctional Managed Care, noted that the policy states that "dental prosthetics are provided when the health of the patient would otherwise be adversely affected." The policy requires dentists to monitor the weight of a patient. "A BMI of 18.5 to 25 is considered normal. Patients with a BMI of 25 or lower which is trending downward, or a patient 10% or more underweight relative to their idea body weight should be referred to the patient's treating physician for consultation." Dr. Horton indicated that his review of the Plaintiff's records did not reveal that he was ever promised dentures. Moreover, the Plaintiff's BMI of 32 or 33 was well above the healthy range and was stable. He did not see a medical necessity for dentures.

The Defendants' legal arguments with respect to the competent summary judgment evidence shall be fully discussed in the Discussion and Analysis section of this Memorandum Opinion.

### Plaintiff's Response

It is again noted that the Plaintiff did not file a response to the motion for summary judgment. On June 8, 2010, he was given additional time to submit a response, but he failed to do so.

### Discussion and Analysis

Deliberate indifference to a prisoner's serious medical needs constitutes an Eighth Amendment violation and states a cause of action under 42 U.S.C. § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105-07 (1976). In *Farmer v. Brennan*, 511 U.S. 825, 835 (1994), the Supreme Court noted that deliberate indifference involves more than just mere negligence. The Court concluded that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; . . . the official must both be aware of

facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In *Domino v. Texas Department of Criminal Justice*, the Fifth Circuit discussed the high standard involved in showing deliberate indifference as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.

239 F.3d 752, 756 (5th Cir. 2001).

The Fifth Circuit has considered a number of denture cases, many of which originated in this Court. One such case was *Hyatt v. Sewell*, 197 Fed. Appx. 370 (5th Cir. 2006). The Fifth Circuit made the following conclusion:

> Hyatt began a treatment plan in December 2002, which included a recommendation for a lower partial denture. Over the course of the next three years, Hyatt received a number of fillings as well as other treatment. Although there were some delays in his treatment regarding his dentures, the summary judgment evidence shows that Hyatt was seen regularly, that treatment was provided, and that any delays were the result of at most negligence rather than any deliberate indifference to Hyatt's serious medical needs.

The Fifth Circuit affirmed this Court's decision granting the defendants' motion for summary judgment.

The next case decided by the Fifth Circuit was *Williams v. Mason*, 210 Fed. Appx. 389 (5th Cir. 2006), which also originated in the Eastern District of Texas. The case was dismissed as frivolous pursuant to 28 U.S.C. § 1915A(b)(1). The plaintiff alleged that he suffered bleeding gums

7

and digestive difficulty, including diarrhea and cramps, due to the failure of the defendant, a dentist, to provide him with dentures. He alleged in his grievances that he suffered from cuts and bleeding gums, which took days to heal, and that certain foods were difficult to chew. The Fifth Circuit specified that taking the plaintiff's claims as true, as required for purposes of initial screening, it did not appear "that no relief could be granted based on his alleged facts." *Id.* at 390. The Fifth Circuit concluded that if the plaintiff suffered the injuries and conditions he alleged, then he may have a serious medical need for dentures. *Id.* The case was remanded, and the plaintiff was provided dentures on remand.

The next case was *Vasquez v. Dretke*, 226 Fed. Appx. 338 (5th Cir. 2007), which also originated out of the Eastern District of Texas. The case was before the Fifth Circuit after the district court had dismissed the case as frivolous and for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915A(b)(1). The Fifth Circuit made the following statement:

> Vasquez has alleged that because he has no dentures, he suffers from difficulty eating, headaches, disfigurement, severe pain, bleeding in his mouth, and blood in his stool. In addition, a doctor recommended dentures for Vasquez. These allegations are sufficient to state a claim for a serious medical need.

*Id.* at 340. The Fifth Circuit rejected the argument that the plaintiff did not have a serious medical need because he did not lose weight. *Id.* The Fifth Circuit upheld the dismissal of the claims against a warden, who merely deferred to the judgment of medical professionals in denying the plaintiff dentures. *Id.* The case was remanded for further consideration.

In *Scribner v. Linthicum*, 232 Fed. Appx. 395 (5th Cir. 2007), the Fifth Circuit reversed this Court's decision granting summary judgment in favor of the TDCJ Director of Medical Services. The Fifth Circuit noted that there was summary judgment evidence that the defendant was aware of the plaintiff's complaints about not receiving dentures and that she had given final approval to the

8

policy that resulted in the denial of dentures. A similar result occurred in *Huffman v. Linthicum*, 265 Fed. Appx. 162 (5th Cir. 2008) (permitting plaintiff to proceed against Director of Health Services Division, Dental Director and Cluster Dental Director).

It is noted that the Plaintiff cited *Jackson v. Mitchell*, Civil Action No. 6:01cv159, in his prison grievances. He asserted that the decision in *Jackson* stands for the proposition that the Eastern District of Texas requires prison dentists to provide inmates with dentures in this type of case. However, the facts of that case do not support the Plaintiff's argument. The record reveals that the parties entered into a settlement just before the case was scheduled to be tried by a jury. The lawsuit was dismissed without prejudice on July 25, 2003. Neither Dr. Mitchell nor UTMB were ordered to provide the plaintiff with dentures. In the original complaint, the Plaintiff also cited *McBride v. Baer*, Civil Action No. 9:07cv60. The Plaintiff asserted that his situation was the same as in *McBride v. Baer*. However, that lawsuit was likewise dismissed as a result of a settlement. The dentists were not ordered to provide the plaintiffs with dentures in either case.

In the present lawsuit, the Plaintiff had problems with his teeth when he arrived at the Texas prison system. His teeth were initially evaluated on September 15, 2003, which was after the implementation of the present policy on dentures. In 2004, Dr. Reinecke indicated that the Plaintiff's bone loss in his mouth was "severe" and that his situation was "hopeless." Dentists began extracting the Plaintiff's teeth as was medically necessary. Defendant Langston played no role in providing the Plaintiff with dental care until August 21, 2008. The plan of extracting the Plaintiff's teeth as medically necessary was already established by the time Dr. Langston first saw him. In the original complaint, the Plaintiff stated that he was suing Dr. Langston because he was the dentist who pulled his teeth. There is no indication, however, that Dr. Langston was deliberately indifferent because

9

he pulled several teeth. Quite the contrary, Dr. Langston noted that he pulled the teeth because of periodontal disease. Dr. Eliasson likewise noted, on May 27, 2009, that all of the Plaintiff's remaining six teeth should be extracted because they were "of no use" and "causing harm." Dr. Langston's actions show that he was responsive to the Plaintiff's dental needs and provided care that was consistently deemed necessary by an array of dentists. The Defendants appropriately noted that there is nothing in the record that shows that Dr. Langston ever intentionally ignored the Plaintiff's complaints or treated him incorrectly.

The Plaintiff's main complaint concerns his desire for dentures. There is no indication in the competent summary judgment evidence that Dr. Langston was ever involved in denying the Plaintiff dentures. Indeed, in his complaint, the Plaintiff did not allege that Dr. Langston denied him dentures. The records show that Dr. Eliasson explained to the Plaintiff why he was not entitled to dentures. The response to the Plaintiff's grievances explained that dentures were not routinely provided. He was also told that dentures will be provided only when there is a "medical necessity," and that there was no indication that he had a medical necessity. The response placed special emphasis on a patient's weight, particularly BMI, and that the Plaintiff's weight and BMI did not give any indication that dentures were medically necessary in his case. It is again noted that there is no indication that Dr. Langston was involved in failing to provide the Plaintiff with dentures; nonetheless, it does not appear that Dr. Langston would have been wrong if he had denied the Plaintiff dentures under the policy. The Court concludes, as a matter of law, that the undisputed competent summary judgment evidence does not support a conclusion that Dr. Langston was deliberately indifferent to the Plaintiff's serious medical needs.

The Defendants argued that Dr. Murray is likewise entitled to summary judgment because he was not deliberately indifferent to the Plaintiff's serious medical needs. They correctly noted that personal involvement is an essential element in any civil rights lawsuit. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). The doctrine of *respondeat superior* does not apply in § 1983 actions. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). Under 42 U.S.C. § 1983, supervisory officials, like Dr. Murray, are not liable for subordinates' actions on any vicarious liability theory. A supervisor may be held liable if either of the following exists: (1) his personal involvement in the constitutional deprivation, or (2) sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations. *Thompkins v. Belt*, 828 F.2d 298, 303-304 (5th Cir. 1987). The Plaintiff did not allege nor show that Dr. Murray had any personal involvement in denying him dentures. Dr. Murray was sued because he is responsible for the dental policy as the Chief Executive of UTMB-CMC. "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Id.* at 304 (citations omitted). The Plaintiff has not shown, however, that the policy of providing dentures only when there is a medical necessity amounts to a repudiation of constitutional rights. *See Gober v. Olivarez*, 2009 WL 2242353 at *6 (S.D. Tex. July 23, 2009). At best, he has shown that he disagrees with the conclusion that there was no medical necessity in his case, but his disagreement with that assessment does not provide a basis for a meritorious deliberate indifference claim. *Estelle v. Gamble*, 429 U.S. at 106. The Court concludes, as a matter of law, that the undisputed competent summary judgment evidence does not support a conclusion that Dr. Murray was deliberately indifferent to the Plaintiff's serious medical needs.

The Defendants next argued that the Plaintiff has not overcome their entitlement to qualified immunity. The defense of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established rights which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The doctrine of qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992), *citing Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

A two-step process has traditionally been employed in evaluating the defense of qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001). Under the traditional approach, a court must first consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, if the plaintiff has satisfied the first step, courts are required to decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* The Fifth Circuit has accordingly held that "a state actor is entitled to qualified immunity if his or her conduct was objectively reasonable in light of the legal rules that were clearly established at the time of his or her actions." *McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2004). More recently, the Supreme Court held that a case may be dismissed based on either step in the qualified immunity analysis: "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in the light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

In the present case, the Court has already concluded that the Plaintiff has not satisfied his burden on summary judgment of showing a violation of his constitutional rights in that he failed to show that the Defendants were deliberately indifferent to his serious medical needs. The Defendants also correctly argued that the Plaintiff failed to satisfy his burden of showing that their conduct was not objectively unreasonable in light of the legal rules that were clearly established at the time of their actions. He has only shown that he has not been provided dentures, but the legal rules that have been clearly established at this juncture do not require prison officials to provide dentures to inmates in all cases where they have no teeth despite the lack of a medical necessity. The Defendants are entitled to summary judgment based on either step in the qualified immunity analysis.

The Defendants finally argued that the Plaintiff failed to overcome their Eleventh Amendment immunity. The Eleventh Amendment provides that the State of Texas, as well as its agencies, are immune from liability. *Kentucky v. Graham*, 473 U.S. 159, 167 (1985). The Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983. *Aguilar v. Texas Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). In *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." The Supreme Court upheld the dismissal of the Michigan Department of State Police and its Director sued in his official capacity. *Id.* The Fifth Circuit has accordingly "held that the Eleventh Amendment bars recovering § 1983 money damages from TDCJ officers in their official capacity." *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

In *Aguilar*, the Fifth Circuit discussed an exception to the Eleventh Amendment immunity principle as follows:

> "In *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity. The Court held that enforcement of an unconstitutional law is not an official act because a state can not confer authority on its officers to violate the Constitution or federal law. *See American Bank & Trust Co. of Opelousas v. Dent*, 982 F.2d 917, 920-21 (5th Cir. 1993). To meet the *Ex parte Young* exception, a plaintiff's suit alleging a violation of federal law must be brought against individual persons in their official capacities as agents of the state, and the relief sought must be declaratory or injunctive in nature and prospective in effect. *See Saltz v. Tennessee Dept't of Employment Sec.*, 976 F.2d 966, 968 (5th Cir. 1992).

*Aguilar*, 160 F.3d at 1054. *See also Mayfield v. Texas Dept. of Criminal Justice*, 529 F.3d 599, 604-05 (5th Cir. 2008). The Plaintiff possibly could obtain prospective injunctive relief from the Defendants in their official capacities, but he has not shown a violation of his constitutional rights warranting prospective injunctive relief. Stated differently, he has not shown a violation of his constitutional rights because he has not been provided dentures, thus he is not entitled to prospective injunctive relief requiring the Defendants to provide him with dentures.

In conclusion, the Defendants have shown that they are entitled to summary judgment and the claims against them should be dismissed. It is accordingly

**ORDERED** that the Defendants' motion for summary judgment (docket entry #30) is **GRANTED** and the lawsuit is **DISMISSED** with prejudice. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

So **ORDERED** and **SIGNED** this **7** day of **July, 2010.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE